UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/31/23
```

——————————————————————x

UNITED STATES OF AMERICA,

      -against-                                11 CR 514 (CM)

EZEQUIEL GUZMAN,

                Defendant.

——————————————————————x

## DECISION AND ORDER DENYING DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE

McMahon, J.:

On January 7, 2013, Ezequiel Guzman was sentenced to a term of 210 months' imprisonment in connection with his plea to distributing methamphetamine, in violation of Title 21, United States Code, Sections 821, 841(a)(1) and 841(b)(1)(A). The Defendant is currently serving his sentence with a projected release date of February 15, 2025.

On April 27, 2022, Guzman filed a motion pursuant to 18 U.S.C. § 3582(c)(1)(A). (*See* Dkt. No. 48).[1] In response, the Court appointed counsel to represent Guzman, and on February 5, 2023, counsel filed a supplemental submission in support of Guzman's request for compassionate release. (*See* Dkt. No. 55). Both Guzman's April 2022 *pro se* motion, and counsel's February 2023 submission seek compassionate release primarily on the basis of the risk the COVID-19 pandemic poses to Guzman's health in light of his underlying medical conditions,

---

[1] On September 13, 2001, Guzman had filed a previous motion to modify his sentence pursuant to 18 U.S.C. § 3582(c)(1)(A). (*See* Dkt. No. 45). However, on January 5, 2022, the Court denied that motion, without prejudice, because Guzman did not exhaust his administrative remedies before filing, and the motion, therefore, was not properly before the Court. (*See* Dkt. No. 47, at 2).

1

which include: diabetes, hypertension, high cholesterol, kidney disease, thyroid disease, and a degenerative corneal disease known as keratoconus.

The Government urges the Court to deny the motion on the grounds that the Defendant had once again failed to exhaust his administrative remedies, failed to demonstrate that extraordinary and compelling circumstances exist justifying his release, and that the Section 3553(a) factors weigh in favor of the Defendant's continued detention.

Background

On November 19, 2010, Federal Express intercepted a package (the "November 2010 Package") that bore indicia of drug trafficking activity. (PSR ¶ 8.) Upon opening the package, Federal Express employees discovered that it contained approximately 10 ounces (283.5 grams) of methamphetamine. (PSR ¶ 8.) Drug Enforcement Administration ("DEA") agents located the individual who had sent the package, and that individual ("CC-1") agreed to speak with law enforcement. (PSR ¶ 9.)

CC-1 informed DEA agents that he had been purchasing methamphetamine from an individual he knew as "Tony" for a period of four years. (PSR ¶ 9.) CC-1 purchased approximately 10 ounces of methamphetamine from "Tony" each month. The transactions generally took place at hotels in Los Angeles. Although CC-1 initially flew the drugs he purchased from "Tony" back to New York City on his person, he eventually began shipping the drugs to himself via Federal Express. (PSR ¶ 9.) CC-1 paid "Tony" between $1,500 and $1,600 per ounce of methamphetamine. (PSR ¶ 9.)

After the November 2010 Package was intercepted, "Tony" told CC-1 that it was too risky to send methamphetamine via Federal Express. Instead, "Tony" began travelling from California to New York to personally deliver methamphetamine to CC-1. (PSR ¶ 11.) CC-1

additionally provided the DEA with detailed logbooks recording each transaction that he conducted with "Tony," including the amount purchased, the date of purchase, and the price CC-1 paid for the drugs. (PSR ¶ 9.) DEA agents were able to identify "Tony" as Ezequiel Guzman, the Defendant. (PSR ¶ 9.)

On February 7, 2011, CC-1 received communications by phone and text from Guzman. (PSR ¶ 12.) Guzman stated that he was in Boston and asked CC-1 if CC-1 "needed" him to come to New York. (PSR ¶ 12.) CC-1 understood Guzman to be asking whether CC-1 was interested in purchasing methamphetamine. (PSR ¶ 12.) CC-1 told Guzman that he wanted to meet. (PSR ¶ 12.)

On February 8, 2011, Guzman checked-in to a hotel in New York. (PSR ¶ 13.) Before he could meet-up with CC-1, Guzman was arrested by federal agents. (PSR ¶ 13.) A search of Guzman's hotel room at the time of arrest uncovered: approximately 900 grams of methamphetamine; approximately $25,000 in United States currency; a scale; and several zip lock baggies. (PSR ¶ 14.)

On June 15, 2011, Guzman waived indictment and consented to the filing of a criminal information against him that charged two counts. (Dkt. Nos. 10 & 11.) Count One charged Guzman with conspiracy to distribute and possess with intent to distribute 50 grams and more of methamphetamine, in violation of Title 21, United States Code, Section 841(b)(1)(A) and 846. Count Two charged Guzman with distributing and possessing with intent to distribute 50 grams and more of methamphetamine on or about February 8, 2011, in violation of Title 21, United States Code, Sections 821, 841(a)(1) and 841(b)(1)(A).

On April 24, 2012, Guzman pleaded guilty to Count Two of the Information before the Honorable Leonard B. Sand, pursuant to a written plea agreement with the Government. (PSR

¶ 6.) On January 7, 2013, Judge Katherine B. Forrest, to whom this case had been transferred, sentenced Guzman to a term of 210 months' imprisonment, to be followed by a term of five years' supervised release. (Dkt. No. 30.) In imposing the sentence, Judge Forrest emphasized the seriousness of Guzman's offense. Although the Defendant had pled guilty to one instance of distributing methamphetamine, the reality was that the Defendant had engaged in methamphetamine transactions "month after month after month" over a "period of four years." (Sentencing Tr. 24:4-6.) In explaining why Guzman's offense was so serious, Judge Forrest explained: "It is because lives were destroyed. Families were destroyed and communities were ripped apart by virtue of this particular drug, by your dealings in drugs and by the overall problem in our society with this. It is not a victimless crime." (Sentencing Tr. 25:3-7.) Judge Forrest also explained that given Guzman's history of drug dealing over time, and the fact that he had done it so often, she was highly concerned that he would do it again. (Sentencing Tr. 25:11-17.)

Compassionate Release

Under 18 U.S.C. § 3582(c), a district court "may not" modify a term of imprisonment once imposed, except under limited circumstances. One such circumstance is the so-called compassionate release provision, which provides that a district court "may reduce the term of imprisonment" where it finds "extraordinary and compelling circumstances." § 3582(c)(1)(A)(i). A motion under this provision may be made by either the Bureau of Prisons or a defendant, but in the latter case only "after the defendant has *fully exhausted all administrative rights* to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.* (emphasis added). Thus, where a compassionate release motion is brought by a

defendant who has not "fully exhausted all administrative rights," the district court "may not" modify his term of imprisonment.

If a defendant demonstrates that he has exhausted his administrative remedies with the BOP, the Court must then consider whether the defendant has met his burden of establishing "extraordinary and compelling circumstances" warranting release.[2] In the past, this Court—and many of my district court colleagues—looked to United States Sentencing Guidelines § 1B1.13 (the applicable Guidelines section for sentencing reductions pursuant 18 U.S.C. § 3582(c)(1)(A)(i)), for guidance on what constituted "extraordinary and compelling circumstances."[3] That changed on September 25, 2020, when the United States Court of Appeals for the Second Circuit held that § 1B1.13 is not applicable to a motion brought by a defendant in the district court. *United States v. Brooker* No. 19-32180-CR, 2020 WL 5739712, at *6 (2d Cir. Sept. 25, 2020). The Second Circuit reasoned that the language of § 1B1.13—language that has not been updated since the passing of the First Step Act—addressed only sentencing reduction

---

[2] "A party with an affirmative goal and presumptive access to proof on a given issue normally has the burden of proof as to that issue." *See, e.g., United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992).

[3] The Application Notes to Section 1B1.13 describe the circumstances under which "extraordinary and compelling reasons" exist. *See* § 1B1.13 comment (n.1). For example, the medical circumstances ground reads as follows:

(A)  Medical Condition of the Defendant—

    (i)  The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia

    (ii)  The defendant is—
        (I)  suffering from a serious physical or medical condition,
        (II)  suffering from a serious functional or cognitive impairment, or
        (III)  experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self- care within the environment of a correctional facility and from which he or she is not expected to recover.

*Id.* § 1B1.13 comment (n.1).

motions initiated by the Bureau of Prisons. *Id.* In making clear that the district court was not constrained by the narrow grounds for granting compassionate release in § 1B1.13, the Second Circuit declared unequivocally that "district courts have discretion to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before [the court] in motions for compassionate release," and that "neither Application Note 1(D), nor anything else in the now-outdated version of Guideline § 1B1.13, limits the district court's discretion." *Id* at *7.

What *Brooker* did not change, however, is the mandate in § 3582(c)(1)(A)(i) that a court contemplating a defendant's release pursuant to that section must first consider the sentencing factors at 18 U.S.C. § 3553(a), to the extent they are applicable, and determine whether they counsel for or against release. A court may still deny compassionate release where the § 3553(a) factors override, in any particular case, what would otherwise be extraordinary and compelling circumstances.

### Guzman Has Again Failed to Exhaust his Administrative Remedies

Guzman claims that he submitted a request for compassionate release to the warden of his facility on March 6, 2022, but he has not yet received a response. (Mot. at 3.) However, Guzman attaches no proof of such a submission to his motion. The Government says that it asked the Bureau of Prisons to search for Guzman's request and the Bureau said that it had no record of any such submission.

Thus, because Guzman has not demonstrated that he has exhausted his administrative remedies, his request for compassionate is denied. *See, e.g., United States v. Keitt*, 21 F.4th 67, 71 (2d. Cir. 2021) (absent waiver or forfeiture by the Government, an inmate must exhaust administrative remedies before seeking compassionate release).

6

Guzman's Motion Before the District Court

Even if Guzman had exhausted his administrative remedies, he still would not qualify for relief because he has not set forth extraordinary and compelling reasons justifying his release. Although Guzman's medical records confirm that he suffers from a host of illnesses, including diabetes, hypertension, hypothyroidism, those records also show that the BOP has satisfactorily managed and treated his myriad conditions over the last decade that he has been in their custody. (*See* Medical Records, Government Exhibit D).

In regard to the corneal condition from which Guzman suffers, keratoconus, the BOP has represented that Guzman is being referred for corneal topography to determine if a transplant is clinically indicated, and if it is, the BOP will see that Guzman receives the transplant.

As for Guzman's assertion that that the risk of contracting COVID-19 in prison exacerbates the dangerousness of his medical conditions, the current state of the COVID-19 Pandemic no longer presents an extraordinary and compelling circumstance warranting early release— not even for those at high risk for severe outcome. The number of new infections has decline precipitously and correspondingly, so has the rate of hospitalizations, and incidence of death. With the development of vaccines and treatment options, COVID-19 is far from the dreaded killer that arrived on our shores in 2020. On May 11, 2023, the Center for Disease Control declared the COVID-19 public health emergency ended. The CDC has now shifted from an emergency response posture "to incorporating COVID-19 activities into sustainable public health practice." *End of the Federal COVID-19 Public Health Emergency (PHE) Declaration*, https://www.cdc.gov/coronavirus/2019-ncov/your-health/end-of-phe.html. Indeed, the incidence of COVID-19 infections throughout the Bureau of Prisons has dropped significantly and BOP is

currently reporting zero infections at Lompoc USP in Lompoc, California. *BOP COVID-19 Statistics*, https://www.bop.gov/ coronavirus/covid19_statistics.html.

And while the Court recognizes that, in close cases, the harsh conditions of confinement that prisoners were forced to endure during the pandemic—when considered together with other reasons offered in favor of release—can help to satisfy the "extraordinary and compelling circumstances" standard for release, this is not one of those close cases. Aside for Guzman's medical conditions, for which the BOP is providing adequate care, the totality of the circumstances here do not favor Guzman's release. This is especially so since Guzman was already given a chance by BOP to serve-out his sentence on home confinement. On June 3, 2021, in the thick of the COVID-19 Pandemic, BOP released Guzman (presumably because of his comorbidities) to home confinement. After serving a little over a year of home confinement, however, Guzman violated the conditions of his release by failing to respond to accountability phone calls as required, and then testing positive for alcohol. (*See* Inmate History and Center Discipline Report in Govt. Response, Exhibits B and C.)

As for the Section 3553(a) factors, Guzman's crime was extremely serious. He sold CC-1 approximately 280 grams of methamphetamine per month for four years. Multiplying those numbers results in a total distribution of over 13 kilograms of methamphetamine–just to CC-1. Moreover, Guzman's involvement in the offense of conviction was not his first brush with the law. As set forth in the PSR, Guzman had been convicted of drug offenses in 1993 and 2006, fraudulent use of a telephone in 1997, and manufacturing false identification documents in 2000. (PSR ¶¶ 30-36.) In connection with those offenses, Guzman collectively was sentenced to over seven years in prison. (PSR ¶¶ 30-36.) Those sentences apparently had little impact. In the

circumstances, the seriousness of Guzman's offense and the need to further deter him from future criminality, out-weighs his desire to obtain medical treatment outside the BOP.

The motion for compassionate release is denied.

Dated: July 31, 2023

_____
Colleen McMahon
District Court Judge